# In the United States Court of Federal Claims

No. 04-1792 C

(Filed: February 2, 2007)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **AAB JOINT VENTURE,** * | |
| * | Implied warranty of specifications; defective |
| Plaintiff, * | specifications; dimension tolerances; |
| * | reliance; change due to response to request |
| v. * | for information; notice and request for |
| * | equitable adjustment requirement for |
| **THE UNITED STATES,** * | constructive change; earthworks; compaction |
| * | of fill; density tests |
| Defendant. * | |
| * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Brian Cohen*, Bell, Boyd & Lloyd, PLLC, Washington, D.C., for Plaintiff.  *Philip Clark Jones*, of counsel.

*Shalom Brilliant*, Senior Trial Counsel, *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant.  *Paul Cheverie*, Command Counsel, *Brett Howard*, Assistant Command Counsel, Europe District, U.S. Army Corps of Engineers, of counsel.

_____

## OPINION

_____

**DAMICH**, Chief Judge.

## I.    Introduction

This case pertains to a government contract for construction of a military storage base in Israel.  The plaintiff, A.A.B. Joint Venture ("AAB") seeks compensation on behalf of its subcontractor, Rolider Ltd. ("Rolider"), for increased costs incurred due to alleged defective specifications and/or alleged changes by the government's responses to certain requests for information ("RFIs").  The claims relate to problems incurred in compacting fill during

earthwork operations.  Before the Court are the parties' cross-motions for summary judgment.[1]
For the reasons set forth below, the Court DENIES Plaintiff's motion and GRANTS Defendant's
motion on the claims for equitable adjustment based on changes to the contract resulting from
Defendant's responses to the RFIs.  With respect to the claim for equitable adjustment based on
defective specifications, however, the Court GRANTS Plaintiff's motion and DENIES
Defendant's motion.

## II.    Background

On June 5, 2001, the U.S. Army Corps of Engineers, Europe District ("USACE")
awarded a fixed price design/build contract to AAB.  Def.'s Resp. to Pl.'s Proposed Findings of
Uncontroverted Fact ("Def.'s Resp. to Pl.'s FF") ¶ 1.  The project under the contract, the
Nachshonim Military Storage Base Project, called for the design and construction of a storage
and logistics complex in Elad, Israel for use by the Israeli Defense Force.  Id. ¶ 2.  AAB
subcontracted with Biri Barashi, Land Works, Development Infrastructure and Road, Ltd.
("Barashi") and Rolider, Ltd. ("Rolider") to perform the earthwork operations for the project.
Compl. ¶ 7.  For testing of earthworks and concrete, AAB subcontracted with Isotop Ltd.
("Isotop").  Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact ("Pl.'s Resp. to
Def.'s FF")  ¶ 12.

The project specifications set forth in the contract were divided into seven divisions.
Def.'s Resp. to Pl.'s FF ¶ 4.  Division 02 contained the Special Specifications for the project.  Id.
The Special Specifications for earthworks were set forth in Section 001, Chapter 51 of Division
02.  Id.  Division 06 of the project specifications, entitled "Host Nation Technical Requirements"
("HNTR"), also referred to as the "General Specifications," contained standard specifications for
earthworks in Israel.  Def.'s Resp. to Pl.'s FF ¶¶ 6-8.

Two sections of the second subparagraph of Section 001, Chapter 51 of Division 02 are
relevant to this dispute.  Section 001-51.02.01B ("Section 01B"), entitled "Excavation and Stone
Cutting in the Area," provided:

> Transfer of the excavated material to fill areas, and dispersal in layers
> 20 cm thick at most.  Excavated material for fill purposes may be
> used as specified in section 510242 of the General Specifications.[2]

---

[1] Although Defendant's motion is couched as a motion for summary judgment, it is in
part a motion to dismiss for lack of subject matter jurisdiction.  Nonetheless, for simplicity, the
Court will refer to it as Defendant's motion for summary judgment.

[2] Section 510242 of the General Specifications (HNTR), entitled "Filling with Rock
Excavation Material," provided:
    Filling that contains more than 20% stones bigger than 12 cm is

(continued...)

App. to J. Prelim. Status Rep. in Case No. 04-1719 C ("JPSR App."), Ex. 17, at 109.

Following Section 01B was Section 001-51.02.03 ("Section 03"), entitled "Compaction of Controlled Fill on Surface Areas and Roads," which provided:

> 2nd. <u>Fill material</u>
> The backfill shall be of rock material.
> Maximum stone size shall be 15 cm. and maximum size
> content shall not exceed 20%.
> Percentage of material passing through a 200 mesh shall not exceed 18%.
> Plasticity index of backfill material shall not exceed 12%.

---

[2](...continued)
> considered "rock excavation material for filling."
> The contractor shall use this material for filling, and if necessary,
> break the larger stones and turn them into filling material, on his
> own expense.  The rock excavation material containing larger
> stones shall be laid and compacted in layers whose thickness
> depends on the size of the stones as follows:
> 1st.    The top layers between the subgrade to minus 100 cm, the
>         maximum stone size shall be 12 cm.  The layers shall be
>         laid though the entire embankment width.  The thickness of
>         each layer shall not exceed 20 cm.  In the top layer
>         (subgrade) the quantity of stones larger than 8 cm shall not
>         exceed 20%.
> 2nd.    Layers between subgrade surface minus 100 cm and minus
>         200 cm, the maximum stone size (largest dimension) shall
>         not exceed 20 cm.  The layers shall be laid through the
>         entire embankment width.  The thickness of each layer shall
>         not exceed 30 cm.
> 3rd.    Layers between subgrade surface minus 200 cm and natural
>         ground surface, the maximum stone size (largest
>         dimension) shall not exceed 45 cm.  The layers shall be laid
>         through the entire embankment width.  The thickness of
>         each layer shall not exceed 60 cm.
> 4th.    If the maximum stone size is smaller than specified in B
>         and C above, the thickness of the layer should be decreased
>         accordingly.

      3rd. <u>Compacting of fill</u>

          Fill up to 1.5 m. below final level shall be laid in layers of
          25-30 cm.  Backfill shall be compacted to 95%-96%
          according to modified A.A.S.H.T.O.
          The Contractor shall be allowed to increase the thickness of
          the layers if he proves on an experimental surface that the
          required density can be achieved.
          Fill of the upper layers (the top 1.5m.), shall be laid in
          layers of 20 cm. compacted to 98% of the maximum
          density according to modified A.A.S.H.T.O.
          Backfill behind the walls of building and retaining walls
          shall be laid in layers of 15 cm. and compacted using hand-
          held vibrational tools to 95% of the maximum density
          according to modified A.A.S.H.T.O.

JPSR App., Ex. 17, at 110-11.[3]

The contract provided that any inconsistency between the plans or drawings, Special Specifications, and the HNTR were to be resolved in the following order: (a) Division 02 Detailed Description of the Works and the Special Specifications, (b) Drawings, and (c) HNTR. Pl.'s Resp. to Def.'s FF ¶ 9.  Due to perceived inconsistencies in Special Specifications Section 01B (which references HNTR Section 510242) and Section 03, AAB sought clarification from USACE through a series of RFIs, three of which are relevant to this motion.

On October 17, 2001, AAB submitted to the contracting officer RFI No. 9 ("RFI 9"), which questioned the accuracy of the limitation on fill layer thickness to 20 cm in Section 01B. Def.'s Resp. to Pl.'s FF ¶ 12; App. to Pl.'s Mot. Summ. J. ("Pl.'s App."), Ex. A, Attach. 8.  In the RFI, AAB pointed out that Section 01B also stated that "Excavated material for fill purposes may be used as specified in Section 510242 for the General [HNTR] Specifications," and HNTR Section 51042 permitted lift thicknesses of between 20 cm and 60 cm.  *Id.*

USACE responded to RFI 9 by stating that, in non-roadway areas, backfill was to be in accordance with the following procedure:

---

[3] A.A.S.H.T.O. stands for the American Association of State Highway and Transportation Officials, a standard-setting organization which publishes procedures to be followed for certain density tests for compacted fill material.  Def.'s Resp. to Pl.'s FF ¶ 16; Def. Resp. to Pl.'s Mot. Summ. J. at 6 n.3.  Throughout the opinion, the Court refers to the organization as "AASHTO" and the prescribed test as "modified AASHTO."  Although there appeared to be some uncertainty as to the meaning of "modified AASHTO" during depositions, Def.'s Resp. to Pl.'s FF ¶¶ 17-19, the parties agree that "modified AASHTO" refers to AASHTO T-180 or ASTM D 1557.  Def.'s Resp. to Pl.'s Mot. Summ. J. at 10-11.  ASTM stands for the American Society of Testing Materials, another standard-setting organization.

When using "rock fill" (that is fill that contains more than 20% stones bigger than 12 cm, reference: HNTR 510242) by "regular compaction" (compaction applied to layers of rock excavation material in which density tests can not be done, reference: HNTR 510261) backfill in accordance with the HNTR paragraph 510242, which reads as follows:

Top layer between the subgrade to minus 100 cm, the maximum stone size (largest dimension) shall be 12 cm.  The thickness of each layer shall not exceed 20 cm.  In the top layer (subgrade) the quantity of stones larger than 8 cm shall not exceed 20%.

2nd layer between subgrade surface minus 100 cm and minus 200 cm, the maximum stone size (largest dimension) shall not exceed 20 cm. The layers shall be laid through the entire embankment width.  The thickness of each layer shall not exceed 30 cm.

3rd layers between subgrade surface minus 200 cm and natural ground surface, the maximum stone size (largest dimension) shall not exceed 45 cm.  The layers shall be laid though [sic] the entire embankment width.  The thickness of each layer shall not exceed 60 cm.

Pl.'s App., Ex. A, Attach. 8.  With regard to roadway areas, USACE stated:

On roadways the same procedure as stated above shall be used except for the means applied to the top 100 cm of fill as referenced in the Special Contract Specifications 001-51.02.03 and typical road sections i.e. drawing 001-03-002.  It shall be backfilled as stated below:

The backfill can be of rock material with the maximum stones size not to exceed 15 cm and the maximum size content shall not exceed 20%. The percentage of material passing through a 200 mesh shall not exceed 18%.  Plasticity index of backfill material shall not exceed 12%.  Fill up to 1.5 m below final level shall be laid in layers of 20 cm. Backfill shall be compacted to 98% according to modified A.A.S.H.T.O.

*Id*.

In late 2001, Isotop informed AAB that it could not test 6-inch material for density using the modified AASHTO standard.  Pl.'s Resp. to Def.'s FF ¶ 13; Def.'s App. at 41-43.  This statement by Isotop was later confirmed in writing.  Pl.'s Resp. to Def.'s FF ¶ 13; Def.'s App. at 72.  On January 4, 2002, AAB submitted RFI No. 22 ("RFI 22"), asserting that neither of the methods identified in Special Specification Section 03 and HNTR Section 510242 was

appropriate for testing material containing 6-inch stones and requesting guidance regarding the type of material required in the top 1.5 meters below sub-grade level and the method to be used to test that material.  Pl.'s Resp. to Def.'s FF ¶ 15; App. to Def.'s Mot. Summ. J. ("Def.'s App.") at 69.

    USACE responded to RFI 22 by stating:

    Specifications clearly require controlled fill in the area referenced.

    Controlled fill is material in which density test can be done.

    The specifications give parameters for the material to be used along with the amount of testing to be done.  However, it is your responsibility to determine the exact material and testing methods are [sic] to be used. Please note that the stone size in question in [sic] which you state could make testing difficult is specified as the maximum stone size.  You are free to use smaller sized stones per the specifications or to minimize the amount of the larger stone in the fill.

    Most importantly, you are required to ensure conformance with the specified density.

Pl.'s Resp. to Def.'s FF ¶ 16; Def.'s App. at 70.  Based on USACE's response to RFI 22, AAB instructed Rolider that 3-inch stone would be the maximum allowed for the top 1.5 meters.  Pl.'s Resp. to Def.'s FF ¶ 23; Def.'s App. at 71.

    Finally, on June 25, 2002, AAB submitted RFI No. DC-0011 ("RFI 11"), proposing that 6-inch stone be used in the upper 1.5 to 1.7 meters in three fill areas.  Compl. ¶ 13; Def.'s App. at 84.  For all other fill areas, AAB proposed that 3-inch stone be used in the upper 1.5 to 1.7 meters.  *Id*.  USACE accepted AAB's proposal.  Def.'s App. at 85; Compl. ¶ 14.  Thereafter, Rolider and Barashi performed earthwork operations in accordance with RFI 11.  Compl. ¶ 16.

    On December 17, 2003, AAB submitted a certified claim to the contracting officer asking for an equitable adjustment of $916,895[4] to cover the additional costs incurred by Rolider as a result of the requirement to use 3-inch fill, rather than 6-inch fill as specified in the contract. Compl. ¶ 17.  The contracting officer failed to issue a final decision within sixty days of receipt of the certified claim.  *Id*. ¶ 19.

    On December 21, 2004, AAB filed suit in this court, requesting compensation in the amount of $1,897,320, pursuant to Federal Acquisition Regulation ("FAR") 52.243-4 (Changes) for the increased costs incurred by its subcontractors as a result of defective specifications and

---

[4] This was later revised to $910,873.

the directive by USACE in response to RFI 11.  Compl. ¶ 23.  In addition to the previously requested $910,873 on behalf of Rolider, AAB also requested $986,447 to compensate subcontractor Barashi for increased costs incurred as a result of placing and compacting 3-inch fill in the upper 1.5 meters in all areas except the three areas designated in RFI 11.  *Id.* ¶ 21.

The Court dismissed the claim on behalf of Barashi in an opinion issued on November 1, 2005, because it had not been previously certified and presented to the contracting officer.  68 Fed. Cl. 363.  Therefore, only AAB's claim on behalf of Rolider is pending in this suit.

Following the close of fact discovery, the parties filed cross-motions for summary judgment.

## III.   Analysis

### A.   Standard of Review

The jurisdiction of the court to entertain a suit is a threshold matter that must be resolved before proceeding to the merits of the dispute.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998).  Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  However, in considering a motion to dismiss for lack of subject matter jurisdiction, the Court must accept as true all of Plaintiff's well-pleaded facts alleged in the complaint, and draw all reasonable inferences in the Plaintiff's favor.  *Goodwin v. United States*, 338 F.3d 1374, 1377 (Fed. Cir. 2003); *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000); *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998).

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c) of the Rules of the U.S. Court of Federal Claims ("RCFC"); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562-63 (Fed. Cir. 1987).  A genuine issue is one that "may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  A material fact is one which might affect the outcome of the litigation under the substantive law.  *Id.* at 248.  The initial burden is on the moving party to show an absence of evidence supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party shows an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to show that a genuine dispute exists with regard to a material fact.  *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 325.  The role of the judge is to weigh the evidence to determine not the truth of the matter, but whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  Any inferences based on the facts must be drawn by the court in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When cross-motions for summary judgment are filed, the court must evaluate each motion on its own merits, drawing all reasonable inference against the party filing each motion. *Mingus Contractors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). The court shall not grant summary judgment in favor of either party if a genuine dispute exists as to a material fact. *Id*.

**B.     Was the Claim for Constructive Change (RFI 9) Presented to the Contracting Officer for Final Decision?**

Plaintiff contends, in its motion for summary judgment, that the government's response to RFI 9 constituted a constructive change entitling it to an equitable adjustment for the increased costs caused by the change. According to Plaintiff, the contract specifications allowed Plaintiff to meet the fill compaction requirements pursuant either to Section 01B (which refers to HNTR Section 510242) using method compaction[5] or to Section 03 using density testing with modified ASSHTO.[6] In its answer to RFI 9, Defendant permitted Plaintiff to follow Section 01B (HNTR method compaction) in non-roadway areas and below the top 1.5 meters in roadway areas, but required Plaintiff to follow Section 01B (modified AASHTO) in the top 1.5 meters in roadway areas. Plaintiff contends that Defendant thereby made an exception to the contract provisions—which allowed either method compaction or controlled compaction—by requiring controlled compaction in the top 1.5 meters in roadway areas and this exception amounted to a constructive change to the contract.

Defendant avers that Plaintiff's claim for constructive change was first raised in Plaintiff's motion for summary judgment and was never presented to the contracting officer for final decision. Hence, Defendant maintains that it is a new claim over which the court lacks jurisdiction. Defendant is in effect asking the Court to dismiss the claim pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction.

The Court of Federal Claims has jurisdiction over any claim in which a decision has been rendered by the contracting officer pursuant to section 6 of the Contract Disputes Act. 28 U.S.C. §1491(a)(2) (2000). Section 6 of the Act provides: "All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting

---

[5] Method compaction, or regular compaction, is used when the fill material is too large for density testing. Pl.'s Mot. Summ. J. at 4. The "method" prescribes the equipment to be used and the process to be followed in order to achieve the desired level of compaction. *Id*.; *see supra* note 2 for method set forth in HNTR Section 510242.

[6] In contrast, controlled compaction uses density testing to determine if the desired level of compaction has been achieved. *Id*. at 8. Density testing measures the dry weight of soil in a fixed volume and compares it to optimum moisture content. *Id*. at 4. There are a variety of methods available for density testing, including modified AASHTO. *Id*.

officer for a decision." 41.U.S.C. § 605(a) (2000).  For claims of more than $100,000, the contractor must certify to the contracting officer that

> the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 605(c)(1) (2000).  A final decision by the contracting officer, or the failure of the contracting officer to render a decision within the specified time period, serves as the basis for appeal to this court.  41 U.S.C. § 609(a) (2002); 41 U.S.C. § 605(c)(5) (2000).

The claim presented by AAB to the contracting officer was a pass-through claim based on subcontractor Rolider's "Financial Demand for Compensation in Light of the Additional Costs Due to Instruction for the Use of 3" Screened Fill Material Instead of 6" Fill Material," which was attached to AAB's claim.  App. to Pl.'s Resp. to Def.'s Mot. Summ. J., attachment 15.  The Rolider claim alleged that in light of the February 11, 2002, instruction by AAB "to fill and compact material with a maximal grain size of 3", spread and processed by controlled compaction to a minimum of 98% Mod. AASHTO," Rolider incurred additional costs.  *Id.* According to Rolider, this instruction amounted to a change to the contract between Rolider and AAB, which contract specified that fill "be spread in layers 30 cm thick and compacted to a level of 95%-96% Mod. AASHTO, uncontrolled."  *Id.*

The only section of the contract between AAB and the government referenced in Rolider's claim was Section 03.  *Id.*  Rolider sought reimbursement for the increased cost of crushing stone to 3 inches as opposed to 6 inches, and for the increased cost of spreading 6-inch material in layers with a thickness of 30 cm as compared to spreading 3-inch material in layers with a thickness of 20 cm.  *Id.*  There was simply no mention in the claim itself of Section 01B of the contract between AAB and the government, and HNTR Section 510242 referenced therein, nor was there mention of the government's response to AAB's RFI 9.  Moreover, the claim contained no assessment of increased costs incurred by Rolider brought about by a change requiring, in the top 1.5 m of roadway areas, utilization of the compaction requirements set forth in Section 03 as opposed to the compaction requirements set forth in Section 01B, which incorporates by reference HNTR Section 510242.[7]

---

[7] For example, the Court notes that HNTR Section 510242, referenced in Section 01B, specifies maximum stone size of 12 cm (5 inches), 20 cm (8 inches), or 45 cm (18 inches), depending on depth; layer thickness of 20 cm, 30 cm, or 60 cm, depending on depth; and method compaction.  In contrast, Section 03 specifies maximum stone size of 15 cm (6 inches); layer thickness of 25-30 cm or 20 cm, depending on depth; and controlled compaction using modified AASHTO density testing, which allegedly can only accommodate 3-inch stone.  There was no

(continued...)

As explained by this Court in an earlier decision in this case:

> This Court does not have jurisdiction over a new claim or a claim of different scope brought by a contractor that was not previously presented and certified to the contracting officer for decision. *Santa Fe Eng'r v. United States*, 818 F.2d 856, 859 (Fed. Cir. 1987). Although a contractor is not precluded from increasing the amount of a claim, a contractor is precluded from presenting a new claim which was not previously presented and certified to the contracting officer. *Id.* at 858; *J.F. Shea Co., Inc. v. United States*, 4 Cl. Ct. 46, 54 (1983). A new claim is "one that does not arise from the same set of operative facts as the claim submitted to the contracting officer." *J. Cooper & Assoc., Inc. v. United States*, 47 Fed. Cl. 280, 285 (2000) (*citing Tecom, Inc. v. United States*, 732 F.2d 935, 936-937 (Fed. Cir. 1984); *see also Foley Co. v. United States*, 26 Cl. Ct. 936, 940 (1992); *Cerebronics, Inc. v. United States*, 13 Cl. Ct. 415, 417 (1987). The same set of operative facts has been found where the contractor submits additional evidence pertaining to damages to support the same factual claim, *Shea*, 4 Cl. Ct. at 55, or where the claim merely "augments the legal theories" underlying the certified claim. *Cerebronics*, 13 Cl. Ct. at 418-419; *Thermocor, Inc. v. United States*, 35 Fed. Cl. 480, 489-490 (1996). In contrast, the same set of operative facts has not been found where the contractor files a different type of claim from that presented to the contracting officer, *Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1570 (Fed. Cir. 1993); *J. Cooper*, 47 Fed. Cl. at 285-286; *Metric Constr. v. United States*, 44 Fed. Cl. 513, 518-519 (1999); *Spirit Leveling Contractors v. United States*, 19 Cl. Ct. 84, 91 (1989), or where the facts require different kinds of proof. *Placeway Constr. v. United States*, 920 F.2d 903, 909 (Fed. Cir. 1990); *Foley*, 26 Cl. Ct. at 940.

*AAB Joint Venture v. United States*, 68 Fed. Cl. 363, 365-66 (2005). Here, the claim for constructive change based on Defendant's response to RFI 9 arises from a different set of operative facts than the claim presented to the contracting officer.

Plaintiff relies heavily on the expert opinion by Dr. Ilan Ishai, which was attached to AAB's claim submitted to the contracting officer. According to Plaintiff, the Ishai opinion serves as evidence that Plaintiff reasonably apprised the contracting officer that it considered Defendant's response to RFI 9 to be a constructive change. Hence, Plaintiff contends that there

---

[7](...continued)
accounting in Rolider's claim for increased costs associated with crushing rock to 3 inches instead of 5 inches, 8 inches or 18 inches; for changes in layer thickness from 60 cm to 20 cm; nor for the use of density testing as opposed to method compaction.

was no circumvention of the role of the contracting officer—the critical test that was followed in *Cerebronics, Inc. v. United States*, 13 Cl.Ct. 415, 418 (1987), and *Thermocor, Inc. v. United States*, 35 Fed. Cl. 480, 488 (1996)—especially since the contracting officer never issued a final decision on the certified claim that was presented to him.

The expert opinion of Dr. Ishai was provided to Rolider as an advisory opinion in view of AAB's February 11, 2002, change order setting a maximum stone size of 3 inches rather than the 6-inch maximum allowed under the Special Specification Section 03.  The opinion does indeed discuss the inconsistency between Special Specification Section 01B (and hence the HNTR) and Section 03, but does not discuss RFI 9, nor a change to the contract brought about by a requirement that Section 03, as opposed to Section 01B, be followed in the top 1.5 m of roadway areas.  Although Dr. Ishai did propose, referencing Section 01B, that Rolider might be able to obtain compensation for costs associated with a change in maximum stone size from 5 inches (12 cm) to 3 inches, as an alternative to the costs associated with a change in maximum stone size from 6 inches to 3 inches, this suggestion did not become part of the actual claim that was presented to the contracting officer.

It is not the responsibility of the contracting officer to anticipate, and attempt to resolve, any and all potential claims that could eventuate based on documents that are attached to a claim that is before him.  *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987) ("[T]he contractor [must] submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."); *J. Cooper & Assoc., Inc. v. United* States, 47 Fed. Cl. 280, 285 (2000); *Dodson Livestock Co. v. United States*, 42 Fed. Cl. 455, 462 (1998) ("The submission of claims to the contracting officer before availing oneself of board or court remedies should not be implied, but must be performed with sufficient specificity to permit the full and intelligent consideration of the claim by the contracting officer.").  Here, no statement was presented to the contracting officer that was sufficiently specific as to apprise him of the basis and amount of a claim based on an alleged constructive change arising from the government's response to RFI 9.  Moreover, even though the contracting officer did not issue a final decision on the claim that was presented to him, there is no basis for the Court to conclude that the same non-response by the contracting officer would have eventuated with a different claim.

The facts here are distinguishable from those in *Cerebronics* and *Thermocor*.  In *Cerebronics*, the second claim differed from the original claim only in that the terminology was different and specific contract provisions were cited.  13 Cl. Ct. at 418.  However, the essence of the claim was the same—namely, that plaintiff was allegedly entitled to compensation for procurement services and a penalty for late payment associated with purchase of a spare jet engine.  *Id.* at 419.  In *Thermocor*, plaintiff submitted a claim to the contracting officer for an equitable adjustment based on work done in excess of the contract, basing its claim on the Variance in Estimated Quantity ("VEQ") clause.  35 Fed. Cl. at 489.  Plaintiff later filed a claim requesting the same equitable adjustment based instead on the Changes clause, under the cardinal change rule.  *Id.*  Hence, the operative facts and relief requested was the same, only the legal

11

theory was different.  Plaintiff contends that, here too, the claim concerns the same operative facts as the claim presented to the contracting officer and that only the legal theory differs.  The Court finds, however, that the underlying factual basis for Plaintiff's current claim is distinct from that set forth in the claim before the contracting officer.  Plaintiff's current claim alleges a change to the contract brought about by the government's requiring compliance with Section 03 (and hence controlled compaction using modified AASHTO density testing) rather than the HNTR (and hence method compaction).  The claim requires the Court to consider the interplay between Section 01B, Section 03, and the HNTR in interpreting the meaning of the contract.  In contrast, the claim before the contracting officer invoked only Section 03, and required the contracting officer to consider an alleged contradiction between the maximum stone size and the modified AASHTO density testing requirements within that provision, which led to the change order issued by AAB to Rolider.  The two claims differ in both the factual basis and the proof required.

Accordingly, the Court finds that Plaintiff's claim asserting a change to the contract by Defendant's response to RFI 9 was not ever presented to the contracting officer for final decision. Accordingly, this Court lacks jurisdiction of that claim.[8]  The Court grants Defendant's motion to dismiss for lack of subject matter jurisdiction Plaintiff's claim for constructive change based on Defendant's response to RFI 9.

## C.    Was Proper Notice of Claim for Constructive Change (RFI 22) Given?

Plaintiff contends that Defendant's response to RFI 22 also constituted a constructive change and, therefore, Plaintiff is entitled to an equitable adjustment for the costs incurred as a result of the change.  Plaintiff argues that, because the Special Specifications required utilization of modified AASHTO, Defendant's statement that "it is your responsibility to determine the exact material and testing methods are [sic] to be used" in its response to RFI 22 constituted a constructive change because it authorized Plaintiff to use a compaction testing method other than modified AASHTO.

Defendant does not specifically address Plaintiff's claim for constructive change as it applies to Defendant's response to RFI 22, leaving the Court on its own to consider the claim. Nonetheless, the Court is able to glean from Defendant's arguments regarding Plaintiff's claims for constructive change based on RFI 9 and RFI 11 what Defendant would likely argue in response to Plaintiff's claim for constructive change based on RFI 22.  With respect to Plaintiff's

---

[8] Defendant makes several additional arguments, including that Defendant has been prejudiced because Plaintiff's claim was not in the complaint; that Section 03 alone governed compaction of fill given the order of precedence rule set forth in Attachment SR-17 to the Special Contract Requirements; and that Plaintiff cannot now complain that Defendant's response to RFI 9 was a constructive change because Plaintiff did not satisfy the written notice requirements set forth in the Changes Clause.  The Court, however, need not consider these additional arguments since it finds that it lacks jurisdiction over Plaintiff's claim.

RFI 9 and RFI 11 constructive change claims, Defendant contends that those claims fail because Plaintiff did not comply with the notice requirements set forth in the Changes clause.

Pursuant to the Changes clause, a directive by the government may be construed as a change order; however, the contractor must give written notice to the contracting officer within 20 days after any costs are incurred as a result of the change, and the contractor must request an equitable adjustment within 30 days of the submission of written notice.[9]  The failure of a

---

[9] The relevant portions of the Changes clause are set forth below:

> (b) *Any other written or oral order* (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) *from the Contracting Officer that causes a change shall be treated as a change order under this clause*; provided that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order. . . .
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.  However, except for an adjustment based on defective specifications, *no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required.*  In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.
>
> (e) *The contractor must assert its right to an adjustment under this clause within 30 days after* (1) receipt of a written change order under paragraph (a) of this clause or (2) *the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of the proposal*, unless this period is extended by the Government.  The Statement of proposal for adjustment may be included in the notice under paragraph (b) above.

(continued...)

contractor to comply with the written notice provision under the Changes clause may result in its claim being disallowed. *Jo-Bar Mfg. Corp. v. United States*, 535 F.2d 62, 66 (Ct. Cl. 1976); *Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 443 (1993); *H.H.O. Co. v. United* States, 12 Cl. Ct. 147, 164 (1987); *Mingus Constructors, Inc. v. United States*, 10 Cl. Ct. 173, 177 (1986). Here, it was incumbent upon Plaintiff to give written notice to the contracting officer that it considered Defendant's response to RFI 22 to constitute a change order and to assert its right to an equitable adjustment within the prescribed time limits.  Neither of these requirements was met.

Plaintiff acknowledges that it did not give written notice to the contracting officer, but argues that written notice is not required when the government has actual knowledge of the facts constituting the constructive change.  Furthermore, Plaintiff avers, the contractor need not assert its right to an equitable adjustment if the government will not be prejudiced, and the burden of showing prejudice lies with the government.[10]

It is true that the notice provisions should "not be applied too technically and illiberally where the Government is quite aware of the operative facts."  *Hoel-Steffen Constr. Co. v. United States*, 456 F.2d 760, 768 (Ct. Cl. 1972).  This Court finds helpful the review of caselaw regarding when to strictly enforce the written notice provision found in *Calfon Constr. Inc. v. United States*, 18 Cl. Ct. 426, 438 (1989).  Therein, it is observed that the notice requirement may not be strictly enforced if the contracting officer gives an oral directive knowing full well that it differs from the specifications.  *Id*.  In contrast, where lack of notice by the contractor forecloses less costly alternative solutions or avoidance of contractor claims by the government, then the notice requirement is likely to be enforced.  *Id*. at 439.  The overriding principle to be followed is that "[w]ritten notice as to constructive changes must be supplied by the contractor before such time that the Government would suffer if not apprised of the facts."  *Id*. at 438.

Here, there is no evidence that the contracting officer had any knowledge that Plaintiff considered its response to RFI 22 to constitute a constructive change.  In fact, the response explicitly stated that it was not a change order.  Furthermore, there is every reason to believe, as Defendant urges, that the contracting officer considered the response to RFI 22 to serve as a relaxation of the specifications rather than as a new requirement which would constitute a change.  After all, Defendant's response did not direct Plaintiff to follow a particular density testing method, but instead allowed Plaintiff to substitute any density testing method of its choosing in place of the modified AASHTO test set forth in the specifications.  Moreover, there

---

[9](...continued)
48 C.F.R. 52.243-4 (2005) (emphases added).

[10] Although Plaintiff also argues that written notice by the contractor is not required when the claim is for constructive change based on defective specifications, the Court finds the argument inapplicable here where the claim is for constructive change based on an alleged directive by the government.

14

is no indication that Plaintiff indicated either orally or in writing to the contracting officer that it intended to seek monetary damages as a result of the alleged change.  As several Claims Court judges have concluded, knowledge by the contracting officer that problems in performance exist should not to be equated with notice of a specific monetary claim against the government. *H.H.O.*, 12 Cl. Ct. at 163; *Mingus Constructors*, 10 Cl. Ct. at 178.

This Court simply cannot find that Defendant would not be prejudiced by the delayed filing of this claim, and that Defendant could not have at least partially remedied the impact if it had received earlier notice.  The government indeed has the discretion to accept a claim from the contractor, despite failure to comply with the notice provisions, prior to final payment.  *Mega Constr.*, 29 Fed. Cl. at 443; *Mingus Constructors*, 10 Cl. Ct. at 177.  And, in the case of an alleged constructive change, the Court of Claims found that "notice of the claim need not be presented 'within the specific number of days allowed' by the Changes clause."  *Jo-Bar Mfg.*, 535 F.2d at 66 (citing *Eggers & Higgins v. United States*, 403 F.2d 225, 236 (1968)).  Nonetheless, "'the filing of a claim within the period of administration of the contract' is plainly a prerequisite."  *Id.*  Plaintiff is simply out of time to file a claim for constructive change.  Because the Court finds that Plaintiff has not met the requirements set forth in the Changes clause, and that Defendant has been prejudiced by the lack of written notice, the Court deems it appropriate to dismiss Plaintiff's present claim for constructive change based on Defendant's response to RFI 22.

### D.        Were the Specifications Defective?[11]

Plaintiff alleges that Section 03 of the Special Specifications was defective in that the specified testing standard for compaction of fill material, modified AASHTO, could not be utilized with the maximum allowable particle size.  According to Plaintiff, the maximum particle size required by the specifications was 6 inches, whereas the modified AASHTO compaction test could not be performed with particles greater than 3 inches in size.  To support its claim, Plaintiff relies on the statement and subsequent letter from Isotop, indicating that 6-inch stone could not be used in the modified AASHTO test.  The crux of Plaintiff's argument is that the specifications

---

[11] Defendant, in its motion for summary judgment, interprets the "directive" referenced in ¶ 23 of Plaintiff's Complaint to be Defendant's response to RFI 11 and understands Plaintiff to be making an additional claim for constructive change based on Defendant's response to RFI 11.  With that understanding, Defendant provides arguments in its motion for why the Court should dismiss Plaintiff's claim.  Plaintiff, in its response to Defendant's motion, clarifies that the "directive" referenced in ¶ 23 is not Defendant's response to RFI 11, but rather the defective specifications themselves.  The Court, therefore, construes ¶ 23 of Plaintiff's complaint to be entirely a claim based on defective specifications.  Accordingly, any relevant arguments regarding Defendant's response to RFI 11 are subsumed into this discussion of Plaintiff's defective specifications claim.

contained two design requirements—one providing for the utilization of up to 6-inch stone and the other requiring compaction testing using modified AASHTO—which were incompatible, rendering the specifications defective and mandating recovery for additional costs.

### 1.      Does Section 03 Require that Modified AASHTO be Used?

Defendant contends that while Section 03 required that fill be compacted to a prescribed density, the provision did not require that the modified AASHTO compaction test be used to measure fill density.  Defendant asserts that Plaintiff was free to utilize other compaction testing methods and was not required perforce to use the modified AASHTO method, provided that the compaction requirement was met.  Defendant points out that the compaction testing method ASTM D 4914 can be used on particles ranging in size from 3 inches to as much as 18 inches.  In fact, Defendant argues, Plaintiff opted to utilize a compaction testing method not set forth in the specifications, ASTM D 1556, and the government acquiesced.  According to Defendant, it is in application of this method that Plaintiff deemed it to be necessary to crush the rock to 3-inch particles.

In order to resolve the dispute, the Court must determine what Section 03 required and whether the requirements were incompatible.  Section 03 clearly required that the maximum stone size be 6 inches as it states:  "Maximum stone size shall be 15 cm. and maximum size content shall not exceed 20%."[12]  Section 03 also required that the fill be compacted to a specified density; however, the parties disagree as to whether the provision also required that the modified AASHTO compaction test be used to verify that the density requirement was satisfied.  Section 03 states: "Fill up to 1.5 m. below final level shall be . . . compacted to 95%-96% according to modified A.A.S.H.T.O. . . . . Fill of the upper layers (the top 1.5 m.), shall be . . . compacted to 98% maximum density according to modified A.A.S.H.T.O."  In other words, the parties agree that fill had to be compacted to 95%-96% or to 98%, but they disagree as to whether the modified AASHTO test had to be used—as opposed to some other compaction test—to show that 95%-96% or 98% density was achieved.

Because the contract provision explicitly recites a density testing standard, modified AASHTO, a reasonable reading of the provision would suggest that the prescribed density test was required.[13]  However, Defendant proffers an alternative interpretation that would not

_____

[12] Fifteen centimeters is approximately equal to 6 inches.

[13] Although deposition testimony revealed some uncertainty regarding what was intended by "modified AASHTO," the parties are in agreement that modified AASHTO means modified Proctor, which is AASHTO T-180 or ASTM D 1557.  *See supra* note 3.  Further, the Court finds that the phrase has routinely been used in other government contracts.  *WRB Corp. v. United States*, No. 67-62, 1968 WL 9146, at *94 (1968); *MacDougald Constr. Co. v. United States*, 122 Ct. Cl. 210, 219 (1952); *Appeal of Wm. Lyon Dev. Co.*, ASBCA No.18097, 74-2 BCA ¶ 10733,

(continued...)

16

perforce require the modified AASHTO test to be used as long as the compaction requirements are met.   The Court finds this to be a strained reading of the contract.  If the provision only requires that the specified percent density be met, why is a density testing standard included at all?  If instead, in an even more subtle parsing of words, Defendant attempts to interpret the provision to require that the specified percent density as measured by modified AASHTO be met, but that another compaction test can instead be deployed to measure that density, the Court is similarly unpersuaded.  From the briefing by the parties, it is clear that there are several suitable methods for measuring fill density, but that each operates differently and has different requirements with respect to fill size.[14]  For example, each of the tests requires different hammers and fill compositions.  Defendant provides no evidence that one method could readily be substituted for another and yield equivalent results and it is, therefore, impossible for the Court to conclude that a density reading of 98% with modified AASHTO is equivalent to a 98% density reading with some other compaction testing standard.  Consequently, for Plaintiff to guarantee that it met a specified density requirement according to modified AAASHTO, Plaintiff would have to use modified AASHTO to measure the density.

The purpose of the specifications is to serve as a guide to the contractor.  The Court doubts that a reasonable contractor would understand the subtle distinctions proffered by Defendant and does not think it fair to require as much.  The contractor should be able to rely on a reasonable interpretation of the contract.  It is common practice in earthworks contracts to specify the density test to be used.  *See*, *e.g.*, *Burn Constr. Co. v. United States*, No. 474-79C, 1981 WL 30799, at *6 (Ct. Cl. 1981); *Ray D. Bolander v. United States*, 186 Ct. Cl. 398, 412 (1968); *WRB Corp. v. United States*, No. 67-62, 1968 WL 9146, at * 94 (Ct. Cl. 1968); *Moyer Bros v. United States*, 156 Ct. Cl. 120, 134 (1962); *MacDougald Constr. Co. v. United States*, 122 Ct. Cl. 210, 216 (1952); *Baltimore Contractors, Inc. v. United States*, 12 Cl. Ct. 328, 340 (1987); *Appeal of Carothers & Carothers Co.*, ENGBCA No. 5015, 88-3 BCA ¶ 21162, 1988 WL 108580 (1988).

Accordingly, the Court finds that Section 03 required both that the fill density meet the prescribed percentage and that the density be determined by modified AASHTO.

---

[13](...continued)
1974 WL 1605 (1974); *Appeal of M.E. Duncan Constr. Co.*, ASBCA No. 13597, 70-1 BCA ¶ 8161, 1970 WL 1147 (1970).

[14] *See*, *e.g.*, Def.'s App. at 44 (ASTM 2922, ASTM 5030, ASTM 4914); Def.'s App. at 66-68 (ASTM 4914); Pl.'s Resp. at 2 n.2 (ASTM D 1556 (the "Sand Cone" test)); Pl.'s App., Ex. A, Attach. 11-13 (AASHTO 99, AASHTO 180, ASTM 1557).

## 2.    Could Modified AASHTO be Performed with the Maximum Stone Size?

Defendant argues that Plaintiff provides no clear evidence that the required compaction standard, modified AASHTO, could not have been performed with 6-inch stone, but merely relies on a self-serving statement by Isotop.  Defendant counters that modified AASHTO could in fact have been performed on fill containing at least some of the maximum stone size allowed under the Contract.  Pl.'s MSJ at 19; Def.'s Resp. to Pl.'s MSJ at 11.  The parties concur that modified AASHTO may be applied to material that retains 30% or less on a 19 mm sieve.[15] Def.'s Resp. to Pl.'s FF ¶ 20.  Therefore, Defendant maintains that even if up to 30% of the fill material were of the maximum 6-inch stone size, the modified AASHTO density test could still be performed.  Defendant points out that Section 03 stipulates that "maximum size content shall not exceed 20%."  Def.'s App. at 31.  Thus, Defendant argues, the contract provision restricted the amount of 6-inch stone to 20% of total fill, well within the percentage allowed by the modified AASHTO compaction test.

Plaintiff responds by noting that utilization of 6-inch stone is prevented very simply by the capacity of the mold used in modified AASHTO, which is only 6.026 inches in diameter and 4.589 inches high.  Plaintiff asserts that even a single 6-inch stone would not fit in the mold and a 4.5 inch stone would completely occupy the mold.   Plaintiff notes that on state highway projects in the United States, typical gradation standards require 100% of the fill material to pass through a 1-inch sieve.  Lastly, Plaintiff asserts that the modified AASHTO compaction test provides that when fill material contains oversized particles preventing application of density testing, method compaction is recommended as an alternative.

The Court finds that Plaintiff has met its initial burden of proving defective specifications.  Plaintiff provides the letter from Isotop stating that the modified AASHTO could not be performed with 6-inch stone.  Moreover, Plaintiff supports its position with evidence showing the infeasibility of using 6-inch stone with modified AASHTO given the size of the mold.  The Court finds Plaintiff's evidence compelling.[16]  The modified AASHTO compaction test is a means for determining the relationship between moisture content and soil density (unit dry weight) when exposed to a given compaction pressure.  Pl.'s App., Ex. A., Attach. 12 ¶ 1.1; Attach 13 ¶ 1.1.[17]  Like other compaction tests, modified AASHTO allows determination of the

---

[15] 19 mm is approximately 3/4 inch.  In other words, 30% of the fill may be greater than 3/4 inch in size.

[16] Although Defendant contends that because Plaintiff is not planning to offer any expert testimony its case will necessarily fail, the Court cannot agree.  There is no requirement that Plaintiff prove its case with expert testimony.

[17] Because Plaintiff fails to provide consecutive page numbering in its appendices, the

(continued...)

Case 1:04-cv-01792-NBF   Document 52   Filed 02/02/07   Page 19 of 25

maximum density that can be achieved for a given soil type and the optimum moisture content for that soil, i.e., the moisture content at which the maximum density can be achieved. *Id.* Attach. 12 ¶ 13.2; Attach. 13 ¶ 11.1. The test is a laboratory test that utilizes compaction molds that are either 4 inches or 6 inches in diameter. *Id.* Attach. 12 ¶ 1.1; Attach. 13 ¶ 1.1. Clearly the point of the test is to determine the moisture content that should be utilized when compacting the soil. It is, therefore, important that the soil specimen that is selected for the laboratory test be representative of the soil in the field that is to be compacted. In fact, if oversize particles are contained in the test specimen and are removed during the sieve procedure, appropriate corrections must be made. *Id.* Attach. 12 ¶ 1.5; Attach. 13 ¶ 1.4. In order to use the molds in the modified AASHTO compaction test, any 6-inch stone would have to be avoided altogether and consequently the test specimen would not fairly represent the soil to be compacted.[18]

Defendant provides no evidence to controvert the evidence offered by Plaintiff and to convince the Court that modified AASHTO can in fact be performed with fill containing some 6-inch stone. The Court further finds that Defendant overstates the importance of the contract provision limiting maximum stone size to 20% of total fill. Even if the Court were to conclude that the modified AASHTO test could be performed with fill containing up to 30% stone of any size greater than 3/4-inch (including 6-inch stone), the provision limiting the amount of maximum size stone would not eliminate the defect in the specifications. While the provision effectively limits the quantity of 6-inch stone to 20% of total fill, the limitation does not extend to stone that is not of maximum size but is larger than 3/4 inch, e.g., stone from 4 inches to 5.5 inches in size. Hence, fill that contained, for example, 20% 6-inch stone and 80% 4-inch stone, would meet the maximum stone size provision, but still could not be used successfully in the modified AASHTO test.

Clearly the modified AASHTO test was not designed for use with gravel of the size provided for under the contract. To arrive at this conclusion the Court relies on both the statement by Isotop, the veracity of which the Court has no basis for questioning, and the standards issued by the AASHTO and the ASTM. Accordingly, the Court rejects Defendant's argument that the modified AASHTO method could be effectively performed using some 6-inch stone and that the contract provision limiting the amount of 6-inch stone to 20% removes any conflict with the provision requiring compaction testing by modified AASHTO.

---

[17](...continued)
Court has done its best to attempt to identify the relevant portions.

[18] Although it may be possible that field density tests (e.g., the sand-cone test or the nuclear density test), which are used to verify that the appropriate density has been achieved following compaction, could be performed on soil specimens containing larger stone, that is irrelevant to the issue of whether 6-inch stone can be used with the modified AASHTO compaction test.

19

3.      **Did the Fact that Modified AASHTO Could Not be Performed
with the Maximum Stone Size Render the Specifications
Defective?**

Defendant urges that there was no defect in the specifications because the compaction
requirement and the stone size requirement were fully compatible—both could be met simply by
using no larger than 3-inch stone.  Defendant distinguishes the facts here from those in *Ehlers-
Noll GmbH v. United States*, 34 Fed. Cl. 494, 499 (1995), another case before the Court of
Federal Claims, in that here the specifications were not impossible or commercially
impracticable to meet because they did not require Plaintiff to utilize the maximum stone size.
Defendant argues that Plaintiff attempts to convert a prohibition against using stones above a
maximum size limit into an entitlement to use all stone up to the maximum size even if doing so
conflicts with other contract provisions.  According to Defendant, Plaintiff essentially turns the
maximum stone size restriction on its head, interpreting it to give Plaintiff greater latitude in
stone size than it would have had were there no restriction at all.

Plaintiff counters that impossibility or commercial impracticability need not be
established to succeed on a claim for defective specifications.  Plaintiff argues that whenever the
government provides design specifications, there is an implied warranty that the specifications
are free from error and the government is held liable if errors in the specification cause the
contractor to incur unanticipated additional costs.

There is indeed an implied warranty by the government that, when the contract contains
design specifications, satisfactory contract performance will result if the contractor follows those
specifications.  *Franklin Pavkov Constr. Co. v. Roche*, 279 F.3d 989, 994-95 (Fed. Cir. 2002);
*Essex Electric Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000); *Stuyvesant
Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987); *Hol-Gar Mfg. Corp. v.
United States*, 360 F.2d 634, 638 (Ct. Cl. 1966); *United States v. Spearin*, 248 U.S. 132, 137
(1918).  "[I]f the contractor is bound to build according to plans and specifications prepared by
the owner, the contractor will not be responsible for the consequences of defects in the plans and
specifications."  *Spearin*, 248 U.S. at 136.  Rather, the government is deemed to have breached
its implied warranty and will be liable to the contractor for the costs proximately resulting from
the breach.  *Franklin Pavkov*, 279 F.3d at 994-95; *Essex Electric*, 224 F.3d at 1289; John
Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, Administration of Government Contracts 272
(4th ed. 2006).

The standard that must be met under the implied warranty is that the specifications will
result in a satisfactory, acceptable or adequate result; short of that, the specifications are defective
and the contractor is entitled to an equitable adjustment.  *Franklin Pavkov*, 279 F.3d at 994
("[W]hen the government provides a contractor with defective specifications, the government is
deemed to have breached the implied warranty that *satisfactory* contract performance will result
from adherence to the specifications. . .") (emphasis added); *Stuyvesant*, 834 F.2d at 1582
("Detailed design specifications contain an implied warranty that if they are followed, an

20

*acceptable* result will be produced.") (emphasis added); *Hol-Gar*, 360 F.2d at 638 ("[T]here is an implied warranty that if the specifications are followed a *satisfactory* product will result.") (emphasis added); *Spearin*, 248 U.S. at 137 (There was a "warranty that, if the specifications were complied with, the sewer would be *adequate*.") (emphasis added).  Hence, a showing of impracticability or impossibility is not required in order to be awarded damages for defective specifications.  *See, e.g., Ordnance Research, Inc. v. United States*, 221 Ct. Cl. 641, 670 ("[S]pecifications having major safety defects are fully as much in breach of the implied warranty as defects in the feasibility, practicability, or commercial possibility of performance as specified."); *see also Appeals of Columbia Eng'g Corp.*, ASBCA No. 32139, 89-2 BCA ¶ 21689, 1989 WL 27594 (distinguishing between doctrine of commercial impracticability or impossibility, which is applicable to performance specifications, and the implied warranty of specifications, which is applicable to design specifications); Frank J. Baltz & Daniel S. Herzfeld, Impracticable Specifications, 34 Procurement Lawyer 3, 5 (Winter 1999) ("Generally, a contractor should use the doctrine of commercial impracticability when the appeal involves 'performance specifications,' but should use the Spearin doctrine when the appeal involves 'design specifications.'").[19]

Where dimension tolerances are set forth in the specifications and items built to those dimensions are not usable as specified, the specifications may be found to be defective.  Cibinic et al. at 281.  The fact that the dimension tolerances in the specifications allow the production of some satisfactory products does not preclude a finding of defective specifications and government liability to the contractor.  *R.E.D.M. Corp. v. United States*, 428 F.2d 1304, 1308 (Ct. Cl. 1970).  "Contractors are ordinarily entitled to assume that parts manufactured in compliance with the prescribed dimensions and permitted tolerances, even the extremes thereof, will, when joined, properly function."  *Id.* (quoting *Ithaca Gun Co. v. United States*, 176 Ct. Cl. 437, 440 (1966)).  Defective specifications may be found when the full scope of the dimension tolerances set forth in the specifications do not produce satisfactory results.  *Id.* at 1308-10 (Ct. Cl. 1970) (finding defective specifications for fuzes warranting equitable adjustment when the thickness of leaves at the high end of the dimension tolerances shown on the drawings prevented contractor from meeting the arming requirement in the specifications); *Ithaca Gun Co. v. United States*, 176 Ct. Cl. 437, 440 (1966) (specifications defective in contract for production of firearms because interferences occurred when the distance between stock prongs was at one end of permitted tolerances and distance between receiver holes was at other end of permitted tolerances); *cf. Gramercy Mach. Corp. v. United States*, No. 3-77, 1980 WL 20849, at *4 (Ct. Cl. 1980) (finding no defect in the specifications when only application of the extremes of four

---

[19]  Moreover, Defendant's argument that Plaintiff has the burden to prove that it exhausted alternatives before concluding that the contract was impossible or impracticable to perform is of no moment because the present claim is for defective specifications based on design specifications, not commercial impracticability or impossibility based on performance specifications.

tolerances set forth in the specifications would cause unacceptable side hole penetration of the center bore of a firing pin holder because such a worst case scenario was so remote as to be of no practical significance).

Although the concept of dimension tolerances is more typically applicable to supply contracts, the concept has also been applied to construction contracts. *Sterling Millwrights, Inc. v. United States*, 26 Cl. Ct. 49, 88 (1992) (government held liable for excess costs incurred by contractor due to defective specifications which failed to properly represent the dimensions of a pit, given the presence of pit bulges, within which the contractor was to construct a chrome-plating facility); *Appeals of Columbia Eng'g Corp.*, ASBCA No. 32139, 89-2 BCA ¶ 21689, 1989 WL 27594 (finding defect in specifications when allowable tolerances for pipes and fittings in contract for installation of sprinkler system resulted in high leakage rate in solvent cement joints).

Here, although Defendant has specified no minimum size limit for the stone to be used for fill, Defendant has clearly specified a maximum stone size. Plaintiff was entitled to rely on the dimensions set forth in the specification and to use stone ranging in size from any minimum size up to 6 inches in performing the contract. The fact that stone covering at least half of the allowed size range could not satisfactorily be used in performing the modified AASHTO test rendered the specifications defective.[20]

### 4.        Was There Reliance on the Defect?

Defendant contends that in order for a contractor to recover an equitable adjustment due to defective specifications it must show that it relied on the defect. Here, Defendant asserts, Plaintiff did not rely on the ability to utilize 6-inch stone in preparing its bid. According to Defendant, Plaintiff's bid would have been the same even if the specifications had prescribed a maximum stone size of 3 inches. Therefore, Defendant contends, even if the specifications were defective, Plaintiff was no worse off than if the specifications were not defective.

In response, Plaintiff avers that both Rolider and Plaintiff based their bids on the understanding that they would be entitled to use 6-inch stone in the top 1.5 meters of fill.[21]   To

---

[20] Although Defendant further argues that the Court should construe the contract based on the parties' contemporaneous interpretation of the agreement (citing various documents and communications as evidence of the parties' construction of the contract during performance), the Court need not look to contemporaneous evidence in interpreting the contract when the contract terms are themselves unambiguous. *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1469 (Fed. Cir. 1998); *McAbee Constr. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). Here, the terms of the contract are clear but are in conflict, rendering the specifications defective.

[21] Plaintiff further argues that proof of reliance is only required when there is an

(continued...)

support its argument, Plaintiff provides the affidavits of Mr. Stephen Denison Keeney (Project Director of the Nachshonim Military Storage Base Project and employee of A.B.B. Sousa, Inc., a construction company which is one of the three partners in A.A.B. Joint Venture) and of Mr. Mordehai Rubinstein (Chief Engineer at Rolider).  App. to Pl.'s Resp. to Def.'s Mot. Summ. J., Exs. A, C.

In order to recover an equitable adjustment for costs incurred due to defective specifications, the contractor must show that it relied on the defect and that the defect was not patent or obvious.  *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004); *Robins Maint., Inc. v. United States*, 255 F.3d 1254, 1257 (Fed. Cir. 2001); *Spearin*, 248 U.S. at 137.  As explained by the Court of Appeals for the Federal Circuit:

> [W]here a contractor-claimant seeks to recover an equitable adjustment for additional work performed on account of a defective specification, the contractor-claimant must show that it was misled by the defect.  To demonstrate that it was misled, the contractor-claimant must show both that it relied on the defect and that the defect was not an obvious omission, inconsistency or discrepancy of significance—in other words, a patent defect—that would have made such reliance unreasonable.

*E.L. Hamm*, 379 F.3d at 1339.  Defendant does not dispute that the defect was not a patent defect[22] and, therefore, the only issue for the Court to consider is whether Plaintiff relied on the defect.

Both the declaration by Mr. Keeney and the declaration by Mr. Rubenstein state that the cost of crushing rock to 6 inches was considered in arriving at the bid price.  Mr. Keeney states that "Joint Venture's intention at the time its bid was submitted was to use backfill material

---

[21](...continued)
ambiguity and that no proof of reliance is required when there is only one reasonable interpretation of the specifications; however, the cases cited by Plaintiff, *Clauss Constr., Inc.*, ASBCA No. 51707, 02-1 BCA ¶ 31678, 2001 WL 1563676, *Southwest Marine, Inc.*, ASBCA No. 46155, 96-2 BCA ¶ 28292, 1996 WL 202561, *Philip Envtl. Serv. Corp.*, ASBCA No. 53445, 02-1 BCA ¶ 31841, 2002 WL 746036, are inapposite.  The cases are not directed to the government's implied warranty based on defective specifications, but rather are directed to application of the doctrine of contra proferentem and requests for equitable adjustment under the Changes clause.

[22] In fact, according to deposition testimony by Michael Roach, who was the Contracting Officer's representative for the Contract, *see* Def.'s App. at 96, even at the time that the government's answer to RFI 9 was drafted, no one at the Army Corps of Engineers recognized the potential for conflict between the 6-inch maximum stone size requirement and the modified AASHTO density testing requirement.  App. to Pl.'s Mot. Summ. J., Ex. D, at 59.

containing stones with a maximum size of six inches." App. to Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. A ¶ 4. As evidence of reliance on the maximum stone size of 6 inches set forth in the specifications, Mr. Keeney refers to the proposal for the Nachshonim project, which was submitted by A.A.B. Sousa to the government[23] and to AAB's Crushing System Specifications.[24] *Id.* ¶ 2-3. Mr. Rubinstein states that, during bid preparation, he relied on 6-inch maximum stone size set forth in the Special Specifications. App. to Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. C. ¶

---

[23] The portion of the proposal entitled "Crushing" provides:

> Two crushing stations will operate at the site. . . . The crushing stations will operate 11 hours each day and process 6,600 tonnes of rock per day. . . . By changing screen decks and chute configurations for various campaigns the crushers will produce six different products: Backfill (150 mm – plus 200 mesh) . . . .

Def. App. at 5. Six inches equals 15 cm, which in turn equals 150 mm.

[24] The Crushing System Specifications provides:

> 3.0 <u>TECHNICAL REQUIREMENTS</u>
> 3.2 <u>Crushing Station No. 1</u> . . .
>> 3.23 <u>Process</u>
>> . . . The Primary Crusher reduces the rock to 85% passing 150 mm and discharges this product to a belt conveyor where it is joined with rock from the Secondary Crusher. The belt conveyor delivers this combined material to the Vibrating Screen. The Vibrating Screen separates the rock, delivering the undersize (100% minus 150 mm) to a belt conveyor which discharges this product to a stockpile. The oversize rock from the Vibrating Screen discharges in to the Secondary Crusher. . . .
> 3.3 <u>Crushing Station No. 2</u> . . .
>> 3.3.3 <u>Process</u>
>> When producing "backfill" material Crushing Station No. 2 operates as described in paragraph 3.2.3 above. When producing "sub-base" material, the screen undersize material (100% passing 150 mm) is transfered [sic] to a belt conveyor were [sic] it is joined with material from a Tertiary Crusher. . .
> 4.0 <u>PERFORMANCE REQUIREMENTS</u>
> 4.2 <u>Crushing System No. 1</u>
>> Crushing System No. 1 shall be capable of processing 330 tonnes/hour of run-of-quarry feed and reducing it to 100% minus 150 mm.

App. to Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. A , Attach. 1, ¶ 3-4.

4-5.  He also states that there is a big difference in the cost of crushing stone to 3 inches as opposed to 6 inches.  *Id*. ¶ 6.

The Court finds sufficient evidence to show reliance by Rolider and AAB on the 6-inch maximum stone size in bid preparation.  Because Defendant provides no evidence to controvert the showing by Plaintiff, the Court concludes that Plaintiff did rely on the specifications provided by Defendant.  Accordingly, Plaintiff is entitled to an equitable adjustment due to the defect in the specifications caused by the conflict between the modified AASHTO density testing requirement and the 6-inch maximum stone size.

## IV.    Conclusion

Plaintiff's Motion for Summary Judgment is DENIED-IN-PART and GRANTED-IN-PART.  Plaintiff's request for summary judgment on Plaintiff's claim for an equitable adjustment based on changes to the contract is denied.  Plaintiff's request for summary judgment on Plaintiff's claim for an equitable adjustment based on defective specifications is granted.

Defendant's Motion for Summary Judgment is DENIED-IN-PART and GRANTED-IN-PART.  Defendant's request for summary judgment on Plaintiff's claim for an equitable adjustment based on defective specifications is denied.  Defendant's request to dismiss Plaintiff's claims for an equitable adjustment based on changes to the contract is granted.

Defendant is liable to Plaintiff for the costs incurred by Rolider due to the defective specifications.  The Court ORDERS the parties to file a Joint Status Report on or before **February 23, 2007**, discussing the quantum of damages and how the parties propose to proceed.

   s/ Edward J. Damich   
EDWARD J. DAMICH
Chief Judge

25